**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

FEDERAL TRADE COMMISSION

        Plaintiff,

      v.

GLOBAL MARKETING GROUP,
INC.; GLOBAL BUSINESS
SOLUTIONS, LLC; GLOBALPAY,
INC.; GLOBALPAY, LLC;
GLOBALPAY BV; SYNERGY
CONSULTING SERVICES, LLC;
FIRST PROCESSING
CORPORATION; and
IRA N. RUBIN;

        Defendants, and

PHOELICIA DANIELS;

        Relief Defendant.

---

$8:06 CV 2272 T 30 TBW$

Case No. _____

**PLAINTIFF FEDERAL TRADE
COMMISSION'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION FOR AN *EX
PARTE* TEMPORARY RESTRAINING
ORDER WITH ASSET FREEZE AND
OTHER EQUITABLE RELIEF**

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

2006 DEC 11  AM 9: 45

FILED



**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     DEFENDANTS KNOWINGLY PROVIDE SUBSTANTIAL
        ASSISTANCE OR SUPPORT TO DECEPTIVE
        AND ABUSIVE TELEMARKETERS ....................................................................... 3

        A.      Rubin Provides Essential Services to Clients that
                He Knows are Engaged in Widespread Fraud .................................................. 4

        B.      Rubin Processes Payments for Clients
                He Knows are Engaged in Fraud .................................................................... 7

                1.      Rubin "Papers the File" to Conceal His Participation
                        in and  Knowledge of His Clients' Illicit Practices .............................. 7

                2.      Rubin Processes ACH Transactions for Outbound
                        Telemarketers in Violation of NACHA Rules ...................................... 9

                3.      Rubin's Clients Generate Outrageously High Return Rates .............. 10

                4.      Rubin Fails to Stop Processing for Clients
                        He Knows are Engaged in Fraud ....................................................... 11

        C.      Rubin Provides Other Forms of Substantial Assistance
                and Support to His Fraudulent Telemarketing Clients .................................... 13

III.    ARGUMENT ........................................................................................................... 15

        A.      This Court Has the Authority to Grant the Requested Relief ........................ 15

        B.      The FTC Meets the Applicable Standard for Issuance
                of a Temporary Restraining Order and a Preliminary Injunction ................... 16

C.  The Evidence Demonstrates an Overwhelming Likelihood
    that the FTC will Prevail on the Merits ......................................... 17

    1.  Defendants Knowingly Provide Substantial
        Assistance or Support to Deceptive and Abusive
        Telemarketers in Violation of the TSR .............................................. 17

        a.  Defendants' clients have repeatedly
            violated sections 310.4(a)(4) and 310.3(a)(4)
            of the TSR .............................................................................. 17

        b.  Defendants provide substantial assistance or
            support to their client telemarketers ........................................ 19

        c.  Defendants knew or consciously avoided
            knowing that their client telemarketers violated the TSR ...... 20

    2.  Defendants' Debiting of Consumers' Bank Accounts
        on Behalf of Deceptive and Abusive Telemarketers Constitutes
        an Unfair Practice in Violation of Section 5 of the FTC Act ............. 22

D.  Defendant Ira Rubin Is Individually Liable ..................................................... 23

E.  The Balance of the Equities Favors the Requested Relief .............................. 25

F.  The TRO Should Be Entered *Ex Parte* And Should Include
    A Receivership, An Asset Freeze, And Other Ancillary Relief ..................... 26

    1.  Receivership ...................................................................................... 28

    2.  Asset Freeze ...................................................................................... 30

3.     Other Equitable Relief ........................................................ 30

IV.   CONCLUSION .......................................................................................... 31

## TABLE OF AUTHORITIES

### FEDERAL CASES

*FTC v. Amy Travel,*
   875 F.2d 564 (7th Cir. 1989) ..................................................................... 23

*FTC v. Bay Area Business Council, Inc.,*
   423 F.3d 627 (7th Cir. 2005) ....................................................................... 4

*FTC v. Gem Merchandising Corp.,*
   87 F.3d 466 (11th Cir. 1996) .............................................................. 15, 22

*FTC v. H. N. Singer, Inc.,*
   668 F.2d 1107 (9th Cir. 1982) ................................................................... 15

*FTC v. J.K. Publications, Inc.,*
   99 F. Supp. 2d 1176 (C.D. Cal. 2000) ................................................. 21, 22

*FTC v. Pantron I Corp.,*
   33 F.3d 1088 (9th Cir. 1994) ..................................................................... 21

*FTC v. Think Achievement Corp.,*
   144 F. Supp. 2d 1013 (N.D. Ind. 2000) ..................................................... 30

*FTC v. U.S. Oil & Gas Corp.,*
   748 F.2d 1431 (11th Cir. 1984) ................................................................. 25

*FTC v. University Health, Inc.,*
   938 F.2d 1206 (11th Cir. 1991) ........................................................... 15, 16

*FTC v. Weyerhaeuser Co.,*
   665 F.2d 1072 (D.C. Cir. 1981) ................................................................ 25

*FTC v. World Media Brokers*,
415 F.3d 758 (7th Cir. 2005) ..................................................................... 23

*FTC v. World Travel Vacation Brokers, Inc.*,
861 F.2d 1020 (7th Cir. 1988) ....................................................... 15, 25, 29

*FTC v. World Wide Factors, Ltd.*,
882 F.2d 344 (9th Cir. 1989) .................................................................... 29

*In re McGaughey*,
24 F.3d 904 (7th Cir. 1994) ..................................................................... 29

*Orkin Exterminating Co., Inc. v. FTC*,
849 F.2d 1354 (11th Cir. 1988) ................................................................ 21

*SEC v. International Swiss Investments Corp.*,
895 F.2d 1276 (9th Cir. 1989) .................................................................. 30

*United States v. First National City Bank*,
379 U.S. 378 (1965) ................................................................................ 29

## DOCKETED CASES

*FTC v. 1492828 Ontario Inc.*,
No. 02 C 7456 (N.D. Ill. filed Dec. 30, 2002) .................................... 13, 20

*FTC v. Amada Guerra*,
No. 6:04-CV-1395-Orl-22KRS (M.D. Fla. Sept. 21, 2004) ...................... 26

*FTC v. Centurion Financial Benefits LLC*,
No. 05 C 5442 (N.D. Ill. 2005) ............................................................... 1, 2

*FTC v. Consumer Alliance, Inc*,
No. 02-C-2429 (N.D. Ill. filed April 4, 2002) ........................................... 7

*FTC v. Debt Mgmt. Foundation Services, Inc.*,
   No. 8:04-CV-1674-T-17-MSS (M.D. Fla. July 30, 2004) ........................................ 26

*FTC v. Gregory Bryant, Jr.*,
   No. 3:04-CV-897-TJC-MMH (M.D. Fla. Sept. 17, 2004) ........................................ 26

*FTC v. Holloway*,
   No. 3:02-CV-343-J20TEM (M.D. Fla. Apr. 12, 2002) ............................................. 26

*FTC v. Para-Link International, Inc.*,
   No. 8:00-CV-2114-T-17TBM, 2001 WL 1701537 (M.D. Fla. Feb. 28, 2001) ........ 25

*FTC v. Para-link, International, Inc.*,
   No. 8:00-CV-2114-T-27E (M.D. Fla. Oct. 17, 2000) ............................................... 26

*FTC v. Peoples Credit First, LLC*,
   No. 8:03-CV-2353-T (M.D. Fla. Nov. 10, 2003) ..................................................... 26

*FTC v. Rothbart*,
   No. 99-1485-CV-ORL-18A (M.D. Fla. Nov. 22, 1999) ........................................... 26

*FTC v. Windward Marketing, Ltd.*,
   No. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga., Sept. 30, 1997) ................. 21, 22

## FEDERAL STATUTES

60 Fed. Reg. 43842, 43852 (August 23, 1995) ........................................................ 3, 4, 18, 19

15 U.S.C. 53(b) ....................................................................................................... 15

15 U.S.C. §§ 57b(a), (b) ........................................................................................... 15

15 U.S.C. § 6105(b) ................................................................................................. 15

Telemarketing Sales Rule,16 C.F.R. § 310 ..................................................................... 2, 16

Fed. R. Civ. P. 65(b) ............................................................................................ 26

Federal Trade Commission Act, 15 U.S.C. § 45(a) .......................................................... 2, 21

## I.    INTRODUCTION

The Federal Trade Commission brings this action to put an immediate stop to a

Tampa enterprise working hand in glove with telemarketers to defraud consumers. The head

of this operation, Defendant Ira N. Rubin, has a 25-year criminal record that includes charges

of money laundering, theft, bank fraud, and wire fraud.[1] Amazingly, this convicted felon

presides over a multi-million dollar payment processing business that provides illegal

telemarketing schemes with *direct access* to consumers' bank accounts. Several of these

companies have been closed by FTC action or prosecuted criminally, including many

telemarketers who promise to provide credit cards to consumers for an advance fee of several

hundred dollars, debit this fee from the bank accounts of consumers (with help from Rubin),

and never provide the promised credit cards.[2] Consumers have lost tens of millions of dollars

to these scams.

Rubin's willingness to provide services to these telemarketers is not affected by his

awareness of their illicit activities. In some cases, after his bank or law enforcement have

shut down a client, Rubin has simply continued doing business with the same client running

the same scam under a new name. He reviews, approves, and even writes the deceptive sales

---

[1]    Indeed, as noted below, an internal investigation completed recently by Bank
of America identified $40 million in suspicious transactions facilitated by Rubin on behalf of
a variety of questionable clients, including diamond and currency traders, offshore pharmacy,
gambling and adult entertainment websites, and an illegal prescription drug enterprise.

[2]    *See, e.g., FTC v. Centurion Financial Benefits LLC*, No. 05 C 5442 (N.D. Ill.
filed Sept. 21, 2005).

scripts used by these clients. Moreover, he knows that the vast majority of transactions originated on behalf of his clients are explicitly forbidden by the rules governing the payment processing system used by Rubin. As a result, Rubin's clients are able to continue stealing money from consumers and Rubin himself is able to continue reaping hefty fees for his services. In support of this motion, the FTC submits two volumes of evidence documenting Rubin's deceptive conduct, including thousands of email messages and other internal documents provided by a former employee of Rubin's.[3]

Because Rubin "knew or consciously avoided knowing" that he was assisting fraudulent telemarketers, his conduct violates both the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR") 16 C.F.R. § 310, and he is therefore jointly and severally liable for all of the consumer injury associated with these scams. The FTC estimates that one of these scams alone is responsible for more than $9 million in consumer injury.[4]

These practices are continuing and every day vast amounts of money are being withdrawn from consumers' bank accounts. We ask that the Court bring these practices to an immediate end. In addition to issuing an *ex parte* temporary restraining order, we are seeking the imposition of an asset freeze and appointment of a receiver. Rubin's longstanding and

---

[3]     Exhibits in Support of the FTC's Motion for TRO, Preliminary Injunction and Other Equitable Relief are included in two volumes of exhibits (hereafter cited as "PX" followed by exhibit and page/paragraph number).

[4]     *See Centurion*, No. 05 C 5442 (N.D. Ill. 2005).

2

ongoing involvement with fraudulent telemarketing schemes, the ease with which he could --
as a payment processor --hide or dissipate assets, and his use of multiple offshore bank
accounts, all underscore the need for immediate injunctive relief. Such relief is necessary to
prevent further consumer injury and preserve assets and critical records pending a final
hearing.

## II.     DEFENDANTS KNOWINGLY PROVIDE SUBSTANTIAL ASSISTANCE OR SUPPORT TO DECEPTIVE AND ABUSIVE TELEMARKETERS

Defendant Ira Rubin specializes in providing a broad range of services to what he
refers to as "high-risk"[5] telemarketers, most -- if not all -- of whom are engaged in fraud or
deception. Rubin and a maze of corporations under his control are jointly and severally liable
for the harm they cause by "assisting and facilitating" telemarketing scams where they "know
or consciously avoid knowing" that the telemarketers are engaged in illegal conduct.[6] Rubin
is not only aware of the illegal activities of his clients, but he is a key player in these scams,
providing payment processing services as well as handling customer complaints, order
fulfillment, and list brokering. He even drafts and edits sales scripts. In other words, Rubin
does everything for his clients but dial the phone.

---

[5]     PX 1 McKenney ¶ 20(h) Att. CC p.28. Similarly, Rubin's office manager
claimed in an email to one prospective business partner that Defendants "are good at getting
ACH processing for high risk clients who usually cannot get ACH processing elsewhere." *Id.*
at p.43.

[6]     TSR, 16 C.F.R. § 310.3(b). As explained below, these practices are also
"unfair" acts or practices in violation of the FTC Act.

3

## A.    Rubin Provides Essential Services to Clients that He Knows are Engaged in Widespread Fraud

Since at least 2003, Rubin has provided payment processing services to at least nine merchants operating illegal advance fee credit card schemes.  In these schemes, telemarketers obtain leads identifying consumers with poor credit histories (which Rubin often provides), cold call such consumers working off of sales scripts (which are often edited or drafted by Rubin) promising to provide them with a credit card in exchange for an advance fee, typically $200 to $300.  After withdrawing these fees from consumers' accounts (with Rubin's assistance), the telemarketers either provide nothing in return or a worthless "benefit package," (which Rubin often purchases and provides to consumers on behalf of the telemarketers) leaving their victims in even worse financial shape.  Finally, the telemarketers must develop a system for effectively brushing off the hundreds or thousands of consumers who inevitably call to complain or demand their money back (Rubin provided these "customer service" functions as well).[7]

It is a *per se* violation of the TSR to charge money in advance of providing a loan or an extension of credit – even if the promised credit cards were actually being provided.[8]  The FTC has already sued two of Rubin's clients, and the individual principals of a third and

---

[7]    The Seventh Circuit described in greater detail a typical advance fee credit scam in *FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005).

[8]    Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(4).  Scripts reviewed and written by Rubin make it clear that his telemarketing clients planned to charge money to consumers in advance of providing the promised credit cards.  PX 1 McKenney ¶ 20(b) Att. W p.28.

4

consumers' bank accounts, however, comes with obvious risks. To address these risks and preserve the integrity of the ACH Network, all ACH participants are bound, through a web of multilateral agreements, by a set of rules implemented and enforced by the NACHA -- the Electronic Payments Network ("NACHA"). NACHA is an industry trade association that oversees the ACH Network. It monitors ACH transaction data, conducts risk management inquiries to detect and deter fraud in the ACH system, and imposes fines against participating financial institutions for violating the NACHA Rules. Rubin's conduct as an ACH processor is openly and consistently contrary to many of NACHA's most fundamental rules.

There is overwhelming evidence that Rubin knows his clients are engaged in fraud and is aware of the vital role he willingly and repeatedly plays in these scams. Rubin has had numerous contacts with law enforcement which have put him on notice that he is assisting telemarketing fraud.[13] Despite these warnings, Rubin has agreed to process for the same type of deceptive telemarketing scams again and again. In many instances, as a result of reviewing and editing his clients' sales scripts, Rubin knew before processing a single transaction that these clients intended to engage in illegal conduct. Moreover, Rubin's well-

---

[13]    For example, the Iowa Attorney General's Office has had extensive communications with Rubin from August 2004 through June 2006 regarding five advance fee telemarketing scams. PX 3 Blake ¶¶ 7-9 (Declaration of Barbara Blake, Iowa Attorney General's Office). As early as September 2004, the Iowa Attorney General's office explicitly warned Rubin that he was providing substantial support and assistance to deceptive telemarketers. *Id.* Rubin has also had multiple contacts with FTC staff over the past three years regarding enforcement actions brought against his clients, yet has continued providing ACH processing services to deceptive telemarketers. PX 1 McKenney ¶¶ 8, 10, 12, 20(e) Att. Z pp.8-9 (subpoena served by Kentucky Attorney General's Office regarding client Trek Benefits).

6

documented habit of openly violating critical safeguards of the ACH system, by itself, demonstrates an awareness of the underlying fraud that he so readily assists.

**B.     Rubin Processes Payments for Clients He Knows are Engaged in Fraud**

Rubin openly flouts NACHA rules and ignores signs which, according to NACHA and other industry authorities, should cause him to seriously question the business practices of his clients. Indeed, each of the nine scams assisted by Rubin involved the following four warning signs identified by NACHA: (1) the origination of hundreds or thousands of identical, one-time ACH debits (2) by merchants engaged in outbound telemarketing who generated (3) high return rates and (4) numerous complaints.[14]  The presence of one of these warning signs should, by itself, trigger remedial action by a responsible processor.  The presence of all four in a series of merchants associated with the same processor is outrageous.

**1.     Rubin "Papers the File" to Conceal His Participation in and Knowledge of His Clients' Illicit Practices**

To minimize fraud and protect the integrity of the ACH Network, NACHA directs ACH processors and their banks to "ensure that they know their customers and are familiar with their business practices."[15]  This is perhaps the most fundamental risk management principal associated with ACH processing. As illustrated in the following email exchange between Rubin and a prospective client, however, it is just one many industry customs that Rubin deliberately does not practice:

---

[14]      PX 4 McEntee ¶¶ 21-27, PX 5 Salaris ¶¶ 14-31.

[15]      PX 4 McEntee ¶¶ 19, 23 Att. B p.2, PX 5 Salaris ¶ 7.

> *Client*: "Page-04 [of the contract states that] Merchant agrees not to call consumers or people with whom no existing relationship is present and we cannot call [consumers on] the DNC[.] Then who do we call?"
>
> *Rubin*: "Your [sic] stating that Global is not aware of your business practices . . ."[16]

In other words, Rubin pretends to know nothing or as little as possible about his clients and their conduct. In practice, this means that Rubin will do business with virtually anyone, regardless of their reputation or background, including individuals subject to ongoing law enforcement actions. For example, Rubin began providing ACH services to Steven Winter in May 2003, less than a month after the FTC sued Winter in connection with his role in *FTC v. Consumer Alliance, Inc.*[17] Rubin also repeatedly provides ACH processing services to merchants who submit applications without required references and with "financials" that consist of nothing more than an individual's bank account showing a balance of a few hundred dollars.[18] Even when in possession of incriminating information

---

[16]     PX 1 McKenney ¶ 20(h) Att. CC p.69. (DNC is an acronym for the FTC's National Do Not Call list).

[17]     No. 02-C-2429 (N.D. Ill. filed April 4, 2002). Ontario Provincial Police arrested most of the principals involved in this scam. *See* PX 1 McKenney ¶ 16 Att. S (complaint).

[18]     *Id.* at ¶ 9 Att. L pp.18-20, 52-54, 59-61, 94-97, 104-109; ¶ 10 Att. M pp.6-30. Examples of Rubin's lax due diligence standards include an internal Global memorandum regarding one client, Trek Benefits. The memo notes that Global currently had no scripts for Trek and that some of the application materials appeared to be forged. *Id.* at ¶ 20(e) Att. Z pp.2,4.

8

take on such merchants, "especially since the odds statistically [are] against [outbound telemarketers] being able to keep [unauthorized] returns" down to acceptable levels.[24]

### 3.   Rubin's Clients Generate Outrageously High Return Rates

Rubin tolerates return rates that are clearly the product of fraud. A "return" is a transaction that has been reversed or sent back, either by the consumer, the consumer's bank, or an entity known as the ACH Operator. Return rates that deviate substantially from normative or average rates are considered an indicia of fraud.[25] Financial institutions and processors such as Rubin are therefore expected to continuously monitor return rates and investigate the business practices of clients who generate unusually high returns. The overall or total return rates generated by Rubin's clients are between 14 and 35 times the national averages. The unauthorized return rates associated with these clients are even more outrageous, regularly topping 100- to 200-times national averages.[26]

---

[24]    *Id.* at ¶ 20(h) Att. CC p.28.

[25]    PX 5 Salaris ¶¶ 7, 14, PX 4 McEntee ¶¶ 21-27. Return data is frequently subdivided between a merchant's overall or total return rate and its percentage of unauthorized returns. NACHA has found that unauthorized returns are frequently associated with fraud. Although there are 68 different reasons why an ACH transaction can be returned, unauthorized returns are associated with just two specific return reason codes ("R" code): R10 (Customer Advises that Charge Was Not Authorized) and R07 (Authorization Revoked by Customer). To initiate such a return and obtain a refund, consumers must complete an affidavit with their bank swearing that they did not authorize the underlying transaction. Thus, focusing solely returns codes R07 and R10 likely grossly under captures the volume of fraud in the ACH system, both because many consumers do not understand their rights under the ACH system and also because other types of returns often stem from transactions involving deceptive sales practices.

[26]    *See, e.g.,* PX 1 McKenney ¶ 26 Table B.

Rubin is unquestionably aware of the excessive return rates generated by his clients.

He receives reports on a daily basis showing origination and return activity for all of Global's

merchants.[27] Indeed, Rubin uses his ridiculously high tolerance of returns as a way of

attracting clients and justifying the steep fees that he charges for his services.[28] This attitude

is reflected, among other places, in several ACH origination contracts negotiated and signed

by Rubin, which explicitly contemplate an unauthorized return "threshold" of 5% -- a rate

equivalent to 71 times the national average.[29]

### 4.    Rubin Fails to Stop Processing for Clients He Knows are Engaged in Fraud

When confronted with high return rates, consumer complaints, and other clear signs

that his clients are engaged in illegal practices, Rubin rarely takes any remedial action other

than to increase his fees. For example, in a letter dated January 23, 2003, Rubin notified a

client, Trek Benefits, that its unauthorized return rate topped 14%, an amount equivalent to

---

[27]    *See, e.g., id.* at ¶ 20(b) Att. W pp.37-43, ¶ 20(h) Att. CC pp.14-23.  Rubin receives similar reports from Pilot Bank.  *Id.* at ¶ 9 Att. L pp.3, 4, 7.

[28]    *See, e.g., id* at ¶ 20(h) Att. CC p.48 ("we are not the cheapest processor out there, but we are . . . still processing for outbound call centers.").  To one prospective client, Rubin stated that Global's acceptable unauthorized return rate is 5%.  *Id.* at ¶ 20(h) Att. CC p.28.  In a deal entered into with another telemarketer, Rubin promised only to charge fees for returns if the client's overall return rate exceeded 68% and the unauthorized rate exceeded 7.5%.  *Id.* at p.59.  These threshold rates set by Rubin are 23 times the national average for all ACH debits returned in 2003 and a staggering 107 times the average unauthorized rate for all debits originated during that year.  PX 5 Salaris ¶¶ 11-12 Att. A.

[29]    PX 5 Salaris ¶¶ 17, 22.  NACHA provides clear guidance to the industry regarding return rates.  Specifically, NACHA directs participants to strive to insure that a merchant's return rate for unauthorized entries remains at or below 0.07%.  *Id.* at ¶ 13.

11

more than *200 times* the national average for all unauthorized debits in 2003.[30]   Instead of

terminating this client, demanding an explanation for the high return rate, or requiring Trek to

take corrective action to reduce its returns, Rubin matter-of-factly informed Trek that he

would be increasing the percentage of each transaction held back in Trek's reserve account.[31]

     Rubin also provides such services to the same individuals over and over again, even

after receiving unambiguous warnings that these individuals are engaged in fraud.  For

example, in a letter dated February 18, 2005, Rubin notified client Tony Marchese that it was

terminating his ACH account effective immediately to protect the company's "law-abiding"

reputation.[32]   Less than a week later, Global opened a new account on behalf of Marchese

doing business under a different name, Sureway Beneficial.[33]   This account remained active

until April 29, 2005, when Rubin's bank forced him to shut down Sureway because of

excessively high chargebacks.[34]   Amazingly, less than two weeks later, Rubin opened yet

another account for Marchese, this time doing business under as Oxford Financial Benefits.[35]

---

[30]     PX 1 McKenney ¶ 20(e) Att. Z p.1; PX 5 Salaris ¶ 28.

[31]     PX 1 McKenney ¶ 20(e) Att. Z p.1.

[32]     *Id.* at ¶ 9 Att. L pp.48-49.  Marchese is a defendant in the FTC's *Centurion* action.  *See id.* at ¶¶ 8-10.  The ringleaders of the Centurion scam, Robert Houttuin and Frank Bellissimo, are long-time Global clients who procured payment processing services from Global for their Liberty Benefits advance fee credit card scam.  *See id.* at ¶¶ 20(c), 25 Table A.

[33]     *Id.* at ¶ 9 Att. L pp.59-62.

[34]     *Id.* at p.7.

[35]     *Id.* at 104.

12

Rubin cuts off clients only as a last resort. For instance, after Pilot Bank ordered

Rubin to terminate a client due to a "staggering" number of complaints from people told

"ridiculous things,"[36] Rubin promised the client that he would "rally in [his] defense" if the

client could provide a "clear explanation" of the problems.[37] Even when ordered to terminate

a client by his bank, Rubin often finds a way of continuing to process for the client, typically

through the use of

a new business name or front person.[38]

### C. Rubin Provides Other Forms of Substantial Assistance and Support to His Fraudulent Telemarketing Clients

Rubin is much more than an ACH processor -- he is a full service telemarketing fraud

---

[36]     *Id.* at ¶ 20(f) Att. AA p.4.

[37]     *Id.* at p.5. This client's telemarketers falsely claimed that they represented a government agency and that consumers who purchased the client's product would receive a $500 gift. *Id.* at pp.7-8. At the time these complaints came pouring into Global, the client, Brentwood Capital, had an unauthorized return rate of 7.47% and an overall return rate of 67%. PX 5 Salaris ¶ 28.

[38]     For example, in a June 2003 email, one of Rubin's employees approvingly noted that Robert Houttuin and Frank Bellissimo, principals of the Dapco/Liberty Benefits telemarketing scam, had undertaken "their yearly clean up," meaning they had adopted new business and product names to evade bank and law enforcement scrutiny. PX 1 McKenney ¶ 20(c) Att. X p.27. *See also* PX 2 Broderick ¶ 7. Two years later, Houttuin and Bellissimo employed a similar tactic with the Centurion scam, going through at least six d/b/as in a single year with no objection from Rubin. PX 1 McKenney ¶ 8 Att. K (*Centurion* First Amended Complaint). Indeed, in April and July 2005, Pilot Bank notified Rubin that he could no longer process for two of the entities associated with the Centurion scam due to consumer complaints regarding credit card misrepresentations. *Id.* at ¶ 9 Att. L pp.5, 7. Rubin nevertheless continued processing for other Centurion entities until September 2005, when the FTC filed its case and the district court entered a restraining order to stop the scam.

13

consultant who provides his clients with virtually every form of assistance needed to steal

money from consumers. These services include list brokering (the provision of sales leads to

telemarketers), order fulfillment (sending worthless "benefits" packages to consumers instead

of the promised credit card), and customer service. Rubin handles these services with the

same lack of ethical principals evident in his ACH business.[39] For example, to a client

interested in telemarketing a stored value card, Rubin boasted that he processes "5000

transactions a month of programs similar to this" and pledged to provide "all the leads you

can handle if its (sic) outbound," even though Rubin himself characterized the sale of these

products as "100% the highest of risks" because they are invariably misrepresented as credit

cards.[40] Similarly, when he provides "order fulfillment" Rubin routinely relies on Paul

Schroeder, who has been sued by the FTC for assisting and facilitating an advance fee

telemarketing scam.[41] In their capacity as customer service representatives for their

---

[39]     In an email to one client, a Global employee noted that the Toronto company
handling fulfillment of the stored value card being sold by this client had "dropped the ball"
so Global therefore needed "to find a new package for you to pitch." *Id.* at ¶ 20(h) Att. CC
p.38. This email was sent by Rubin's office manager, Eva Sims, who copied Rubin.

[40]     *Id.* at pp.63-64. *See also* PX 7 Hunt ¶¶ 8-9; PX 1 McKenney ¶ 20(b) Att. W
p.33 ("Ira had spoke to me about sending you guys 10000 leads of recent credit card turn
downs."), p.36 (ordering 1200 fulfillment packages on behalf of United Card Services),
¶ 20(c) Att. X pp.21-22 (fulfillment for Dapco/Liberty Benefits), ¶ 20(h) Att. CC p.60 (list
brokering).

[41]     *See FTC v. 1492828 Ontario Inc.*, No. 02 C 7456 (N.D. Ill. filed Dec. 30,
2002). PX 1 McKenney ¶ 15 Att. S (complaint). Indeed, Defendants purchased over $11,000
worth of fulfillment packages from Schroeder in April 2003, four months *after* the FTC filed
its complaint against him. *Id.* at ¶ 20(h) Att. CC pp.24-25.

14

telemarketing clients, Rubin and his employees regularly receive complaints from defrauded consumers regarding unauthorized debits, credit card misrepresentations, non-delivery of products, and other illicit practices.[42] The actual "service" provided by Rubin to consumers is a nightmare of unreturned phone calls, legal threats, and deception, all designed to exhaust consumers, limit refunds, and – most importantly – allow Rubin's telemarketers to continue victimizing consumers.

## III.   ARGUMENT

The Commission seeks a temporary restraining order, an asset freeze and appointment of a receiver to prevent Defendants from violating the law pending final resolution of this case and to preserve the possibility of effective final relief. The facts outlined above demonstrate that Defendants knowingly provide vital services to their telemarketer clients and that these services enable such clients to steal millions of dollars from consumers. Defendants maintain multiple offshore bank accounts, significantly increasing the risk that money will disappear if Rubin is given notice before the Court has an opportunity to put an asset freeze and receivership in place. The Court has full authority to enter the relief sought by the FTC, and the facts strongly support issuing such relief.

### A.   This Court Has the Authority to Grant the Requested Relief

A district court may issue preliminary and permanent injunctions to enjoin violations

---

[42]      *Id.* at ¶ 20(g) Att. BB pp.1-8 (answering service agreement), ¶ 20(h) Att. CC pp.30-38 (answering service agreement), 61, 62, 65-66, ¶ 20(b) Att. W. p.23 (Defendants receiving "a slew of calls" from unhappy consumers regarding United Card Services), p.34 ("numerous calls and complaints"), ¶ 21 Att. DD.

15

of the FTC Act, *see* 15 U.S.C. 53(b), *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468

(11th Cir. 1996), and may order all such preliminary relief "that may be needed to make

permanent relief possible," including the "full range of equitable remedies." *Id.* at 469-70.

Courts appropriately invoke the remedies of Section 13(b) in cases such as this involving

fraud. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1024-28 (7th Cir. 1988);

*FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982).

The TSR also authorizes the Court to exercise its equitable powers. All remedies

provided by the FTC Act are available under the TSR. *See* 15 U.S.C. § 6105(b). Courts are

authorized to grant relief necessary to redress injury to consumers caused by violations of

FTC rules prohibiting unfair or deceptive practices, such as the TSR, including "rescission or

reformation of contracts, the refund of money or return of property." 15 U.S.C. § 57b(a), (b).

## B.     The FTC Meets the Applicable Standard for Issuance of a Temporary Restraining Order and a Preliminary Injunction

Section 13(b) of the FTC Act authorizes a temporary restraining order and a

preliminary injunction "[u]pon a proper showing that, weighing the equities and considering

the Commission's likelihood of ultimate success, such action would be in the public interest."

15 U.S.C. § 53(b). In the Eleventh Circuit, courts consider two factors in determining

whether to grant a preliminary injunction under Section 13(b) of the FTC Act: (1) the

likelihood that the FTC will succeed on the merits; and (2) the balance of equities. *See FTC

v. University Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991); *World Travel*, 861 F.2d at

1029. Unlike litigation between private parties, irreparable injury is presumed in a case

16

brought under Section 13(b).  *See University Health*, 938 F.2d at 1218.

### C.    The Evidence Demonstrates an Overwhelming Likelihood that the FTC will Prevail on the Merits

The evidence demonstrates that Defendants provide substantial assistance to deceptive and abusive telemarketers in violation of the TSR by processing ACH transactions on behalf of numerous fraudulent telemarketing scams, and by providing other forms of assistance to these scams, including customer service, order fulfillment, and list brokering. Thus, the evidence establishes that the FTC is likely to succeed on the merits in this case.

#### 1.    Defendants Knowingly Provide Substantial Assistance or Support to Deceptive and Abusive Telemarketers in Violation of the TSR

The "assisting and facilitating" provision of the TSR prohibits a person from providing "substantial assistance or support" to any telemarketer when that person "knows or consciously avoids knowing" that the telemarketer is engaged in acts or practices that violate Sections 310.4(a)(4) or 310.3(a)(4) of the TSR. 16 C.F.R. § 310(b).  Thus, to establish that Defendants violated this provision, the Commission must demonstrate that: (1) Defendants' telemarketer client violated Sections 310.4(a)(4) or 310.3(a)(4) of the TSR; (2) Defendants provided "substantial assistance or support" to their client; and (3) Defendants "knew or consciously avoided knowing" that the client engaged in the unlawful practices.

##### a.    Defendants' clients have repeatedly violated sections 310.4(a)(4) and 310.3(a)(4) of the TSR

Section 310.4(a)(4) of the TSR flatly prohibits telemarketers from requesting or receiving payment of a fee in advance of providing, or promising to provide, a credit card or

loan. Such conduct is a *per se* violation of the TSR. Evidence presented by the FTC

demonstrates unequivocally that many of Defendants' ACH processing clients operated

advance fee credit card telemarketing schemes. Four of Defendants' clients have been

subject to law enforcement actions for engaging in this exact conduct:  Centurion Financial

Benefits, First Approval Benefits, United Card Services, and Mountain Peak Financial.[43]

These cases were filed after lengthy investigations that produced overwhelming evidence,

including consumer and investigator declarations. In three of these cases there are final

judgments and specific findings by the court that Defendants' clients operated illegal advance

fee credit card telemarketing schemes. In the fourth case, *Centurion*, the FTC's unopposed

motion for judgment on the pleadings against the scam's two ringleaders is currently pending

before in the Northern District of Illinois.

Defendants' clients also violated Section 310.3(a)(4) of the TSR, which prohibits

telemarketers from making misleading statements to induce consumers to purchase goods or

services. In each of the advance fee credit card schemes facilitated by Defendants, the

telemarketers deceptively promised consumers that they would receive a credit card, but

never fulfilled that promise. In some cases, consumers received nothing; the telemarketers

simply took the consumer's money, with substantial assistance from Defendants. In other

cases, consumers received bogus "benefits packages" and other relatively worthless items for

which they never bargained.

---

[43]     *See, e.g.*, PX 1 McKenney ¶¶ 8-14, Atts. J-Q. In the interest of judicial
economy, only select portions of the record in each case have been filed herewith.

18

b.    Defendants provide substantial assistance or support to their
      client telemarketers

Defendants provide substantial assistance or support to telemarketers by processing

thousands of ACH transactions, worth millions of dollars, on behalf of their telemarketer

clients. Under the TSR, "substantial assistance" requires only that "the requisite assistance

must consist of more than mere casual or incidental dealing with a seller or telemarketer that

is unrelated to the violation of the Rule."[44] Indeed, Defendants provide telemarketers with

access to the ACH Network and the ability to electronically debit consumers' accounts.

Absent this critical relationship, telemarketers cannot withdraw funds from consumers' bank

accounts.

Defendants cultivated lucrative business relationships with the telemarketers that

lasted months, and in some cases, years. These business relationships involved daily contact

and the routine exchange of sensitive data. Defendants electronically processed thousands of

transactions and forwarded the proceeds to the telemarketers' bank accounts after deducting

substantial processing fees. Especially when viewed in light of the other forms of assistance

provided by Defendants, including order fulfillment and customer service, this extensive and

ongoing relationship is more than a "mere casual or incidental dealing" with the

telemarketers. Thus, Defendants' conduct more than satisfies the "substantial assistance or

support" standard.

---

[44]    60 Fed. Reg. 43842, 43852 (August 23, 1995) (Statement of Basis and
Purpose of the original TSR). The pertinent language in 16 C.F.R. § 310.3(b) was unchanged
in the recent amendments to the TSR.

19

c.      Defendants knew or consciously avoided knowing that their
        client telemarketers violated the TSR

Rubin knew or, at the very least, consciously avoided knowing, that his telemarketer

clients were marketing credit cards for an advance fee and doing so through deceptive

misrepresentations. Although there is overwhelming evidence that Rubin actually knew

about his clients' illegal practices, the Commission need not prove actual knowledge, only

that Rubin consciously avoided knowing the nature of his clients' conduct. The "conscious

avoidance" standard in Section 310.3(b) of the TSR is "intended to capture the situations

where . . . there are facts and evidence that support an inference of deliberate ignorance."[45]

As noted above, Rubin directs his clients to not tell him what he doesn't need to know. Such

statements, combined with Rubin's ongoing pattern of knowingly processing thousands of

identical debit entries for outbound telemarketers in blatant violation of the NACHA Rules --

in many cases for the same clients -- more than supports an "inference of deliberate

ignorance."

The evidence presented above establishes that Defendants knew that their clients were

engaged in illicit practices. Sales scripts reviewed, edited, and approved by Defendants

clearly indicate many of their clients intended to sell advance fee credit cards. Some of these

scripts openly pitched credit cards or used terminology closely associated with credit cards.

In fact, at least four of Defendants' clients have been sued by law enforcement for operating

unlawful advance fee credit card schemes. These clients were sued in April 2003, September

---

[45]      60 Fed. Reg. at 43852 n.105 (August 23, 1995).

20

2003, April 2004, and most recently in September and December 2005.[46] In connection with these cases and other fraud investigations, law enforcement have contacted Defendants directly on numerous occasions and placed them on notice that they are assisting telemarketing fraud.

Defendants' knowledge of their clients' illicit activities can be readily inferred from several other indicia of fraud associated with these clients, including: (1) the receipt of consumer complaints; (2) the use of fictitious names by clients; (3) the telemarketers' clear connections to Canada; (4) the common range of dollar amounts for all of the transactions; (5) blatant violation of NACHA Rules by processing for outbound telemarketers; and (6) the extraordinarily high return rates associated with these clients. Defendants not only tolerated return rates that were, in some cases, *hundreds* of times the normative rate for legitimate merchants, but they negotiated origination agreements that explicitly contemplated outrageously high return rate thresholds. When these factors and the evidence described above are considered together, any claimed lack of knowledge on the part of Defendants can only be the result of conscious avoidance. More likely, Defendants knew exactly what their clients were doing, but disregarded the law in order to reap huge profits at the expense of innocent consumers.

---

[46] As noted above, the FTC sued a fifth client, Paul Schroeder, in connection with his role in a massive Canadian telemarketing scheme. *See FTC v. 1492828 Ontario Inc.*, No. 02 C 7456 (N.D. Ill. filed Dec. 30, 2002). Several months *after* the FTC brought this lawsuit, Rubin purchased hundreds of fulfillment packages from Schroeder. *See* PX 1 McKenney ¶ 20(h) Att. CC pp.24-25.

21

### 2. Defendants' Debiting of Consumers' Bank Accounts on Behalf of Deceptive and Abusive Telemarketers Constitutes an Unfair Practice in Violation of Section 5 of the FTC Act

Under Section 5(n) of the FTC Act, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n). *See also Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1363-66 (11th Cir. 1988); *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000); *FTC v. Windward Marketing, Ltd.*, No. 1:96-CV-615F, 1997 WL 33642380, at \*10 (N.D. Ga., Sept. 30, 1997). By providing ACH processing services to merchants engaged in deceptive and abusive telemarketing practices, Defendants have engaged unfair acts or practices in violation of the FTC Act.

First, the "substantial injury" prong of the unfairness standard is more than satisfied because Defendants' conduct caused financial harm to tens of thousands of consumers.[47] Had Defendants complied with the basic due diligence and risk management obligations expected of all industry participants, this substantial consumer injury would not have been possible. Second, the substantial injury was not reasonably avoidable by consumers. The focus for whether injury is avoidable by consumers is "whether consumers had a free and

---

[47] Under the FTC Act, injury may be substantial if it causes small harm to a large class of people. *J.K. Publications*, 99 F. Supp. 2d at 1201; *Windward Marketing*,1997 WL 33642380, at \*11; *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) ("[C]onsumer injury is substantial when it is the aggregate of many small individual injuries.").

22

informed choice that would have enabled them to avoid the unfair practice." *Windward Marketing*, 1997 WL 33642380, at *11; *see also J.K. Publications*, 99 F. Supp. 2d at 1201. Consumers typically are not familiar with the intricacies of the ACH Network, much less the role played by third-party service providers, and have no opportunity either to verify the legitimacy of the company handling payment processing for their transaction or select a reputable processor. The third prong of the unfairness standard is also satisfied because there is no countervailing benefit to either consumers or competition resulting from Defendants' conduct. To the contrary, Defendants' conduct not only causes substantial economic harm to consumers, but also to consumers' banks for processing requests by consumers seeking to avoid unauthorized charges. Moreover, Defendants' practices threaten to undermine consumers' and banks' confidence in the safety and reliability of the ACH Network. The only beneficiaries of Defendants' unfair practices are Defendants themselves and their fraudulent clients, all of whom reap substantial profits at the expense of vulnerable consumers and the integrity of the ACH Network.

## D.    Defendant Ira Rubin Is Individually Liable

Abundant evidence demonstrates that Ira Rubin is the central player in the deceptive practices inflicted upon consumers by the corporate Defendants. Individuals may be held liable for corporate violations of the FTC Act if the individuals: (1) participated directly in or had some measure of control over the corporation's practices; and (2) had or should have had some knowledge or awareness of the practices. *See Gem Merchandising*, 87 F.3d at 470; *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005); *FTC v. Amy Travel*, 875

23

F.2d 564, 573 (7th Cir. 1989). Authority to control can be evidenced by "active involvement in the corporate affairs, including assuming the duties of a corporate officer." *World Media Brokers*, 415 F.3d at 764 (citing *Amy Travel*, 875 F.2d at 573). The FTC "is not required to prove subjective intent to defraud. Instead, the FTC may fulfill the knowledge requirement with evidence that the individuals had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* (citations and internal quotation marks omitted). An individual's "degree of participation in business affairs is probative of knowledge." *Amy Travel*, 875 F.2d at 573.

Ira Rubin is the sole shareholder and officer of corporate defendants Global Marketing Group and GlobalPay Inc., which themselves are the parent entities of defendants Global Business Solutions and Globalpay, LLC. Rubin also holds himself out as vice president of defendant First Processing Corporation and is the owner of Globalpay BV and Synergy Consulting Services. In addition to serving as an officer of all the corporate defendants, Rubin is intimately involved in the day-to-day operations of these companies. Among other things, he travels regularly to Canada to both recruit new clients and manage the Global's relationship with its existing client base;[48] he negotiates processing agreements

---

[48]     PX 1 McKenney ¶ 10 Att. M p.5 (*Centurion* defendant, Frank Bellissimo, promises to take Rubin out to dinner while Rubin is in Toronto); ¶ 20(h) Att. CC p.7; PX 2 Broderick ¶ 7. Indeed, Rubin formed a joint venture between one of his companies, EFT Commerce, LLC, and a Canadian payment processor, EFT Canada Inc. PX 1 McKenney ¶ 20(h) Att. CC pp.52-58. A March 2004 press release announcing the partnership states that
(continued...)

24

with merchants and also handles modification and termination of such agreements;[49] he serves as one of Global's primary contacts with the bank that provides Defendants with access to the ACH Network;[50] he reviews, edits, and approves of sales scripts used by clients;[51] he receives and reviews daily reports detailing returns generated by clients;[52] and he handles law enforcement inquiries regarding Global's clients.[53] This evidence unambiguously demonstrates that Rubin participated in or controlled the deceptive practices at issue, and that he knew or should have known about the underlying conduct. Therefore, Rubin should be held individually liable.[54]

## E.    The Balance of the Equities Favors the Requested Relief

Not only is the FTC likely to succeed on the merits, the balance of the equities tips strongly in the FTC's favor. In balancing the equities, the Court must assign greater weight

---

(...continued)

Rubin's company had "acquired the exclusive rights to market into the United States, all of EFT Canada Inc.'s electronic transaction processing solutions." *Id.* at ¶ 4(e) Att. E, pp.6-7.

[49]     *Id.* at ¶ 20(d) Att. Y p.15;¶ 20(e) Att. Z p.1; ¶ 20(h) Att. CC pp.28-29, 47-51, 59, 63-64, 68-70; PX 7 Hunt ¶¶ 8-11.

[50]     PX 1 McKenney ¶ 9 Att. L pp.4, 5, 7; ¶ 20(h) Att. CC p.39.

[51]     *Id.* at ¶ 20(b) Att. W pp.27-28, 30-32.

[52]     *Id.* at ¶ 20(b) Att. W, pp.37-43; ¶ 20(h) Att. CC, pp.14-23; ¶ 9 Att. L, pp.3, 4, 7.

[53]     PX 3 Blake ¶¶ 7-11, 13-16, 18.

[54]     For purposes of obtaining monetary relief, the FTC has also named Rubin's wife, Phoelica Daniels, as a relief defendant in this action.

to the public interest advanced by the FTC than to any of Defendants' private concerns. *World Travel*, 861 F.2d at 1029; *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone would not suffice to justify denial of a preliminary injunction.").

The public equities are compelling in this case. The public has a strong interest in preventing further abuse of the ACH Network by Defendants and their fraudulent clients and in preserving assets necessary to effective final relief. In contrast, Defendants have no legitimate interest in persisting with unlawful conduct. *See FTC v. Para-Link Int'l, Inc.*, No. 8:00-CV-2114-T-17TBM, 2001 WL 1701537 (M.D. Fla. Feb. 28, 2001) (recognizing that the public interest in preventing the sale of deceptive work-at-home business opportunity outweighs any harm to promoters of the opportunity, their employees, and independent contractors). Here, the balance of the equities even more strongly favors the FTC because of the strong likelihood of success on the merits of its claims.

## F.     The TRO Should Be Entered *Ex Parte* And Should Include A Receivership, An Asset Freeze, And Other Ancillary Relief

The FTC Act authorizes a district court to use its inherent equitable authority to "grant any ancillary relief necessary to accomplish complete justice." *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984). Here, the FTC requests that the Court issue a TRO including an asset freeze, appointment of a receiver, and other ancillary relief necessary to put an immediate halt to Defendants' illicit practices and preserve the possibility of

26

providing meaningful relief to victimized consumers.[55] In cases brought pursuant to the FTC
Act, judges in this District have repeatedly issued *ex parte* temporary restraining orders
containing the type of relief sought here by the Commission.[56]

*Ex parte* relief is necessary here. An *ex parte* TRO is warranted where the facts show
that irreparable injury, loss, or damage will result before the defendants can be heard in
opposition. *See* Fed. R. Civ. P. 65(b). Part of the relief sought by the FTC in this case is
restitution to consumers who were defrauded as a result of Defendants' conduct. The FTC
seeks to freeze Defendants' assets to preserve the possibility of such relief. The FTC's past
experiences have shown that defendants engaged in similar schemes may withdraw funds
from bank accounts if given notice of the FTC's action.[57] In this case, Defendants' deceptive
actions, coupled with the ease of transferring funds, their maintenance of overseas bank
accounts, and Rubin's prior criminal conviction for bank, wire, and mail fraud, support the
likelihood that these Defendants would destroy or conceal documents and conceal or

---

[55]    The FTC has submitted a Proposed Temporary Restraining Order with its
papers.

[56]    *See, e.g.*, Appendix of Unpublished Orders, *FTC v. Amada Guerra*, No. 6:04-
CV-1395-Orl-22KRS (M.D. Fla. Sept. 21, 2004); *FTC v. Gregory Bryant, Jr.*, No. 3:04-CV-
897-TJC-MMH (M.D. Fla. Sept. 17, 2004); *FTC v. Debt Mgmt. Found. Servs., Inc.*, No.
8:04-CV-1674-T-17-MSS (M.D. Fla. July 30, 2004); *FTC v. Peoples Credit First, LLC*, No.
8:03-CV-2353-T (M.D. Fla. Nov. 10, 2003); *FTC v. Holloway*, No. 3:02-CV-343-J20TEM
(M.D. Fla. Apr. 12, 2002); *FTC v. Para-link, Int'l, Inc.*, No. 8:00-CV-2114-T-27E (M.D. Fla.
Oct. 17, 2000); *FTC v. Rothbart*, No. 99-1485-CV-ORL-18A (M.D. Fla. Nov. 22, 1999).

[57]    *See* Declaration of Certification of Plaintiff's Counsel Pursuant to Fed. R. Civ.
P. 65(b) and Local Rule 5.5(D) In Support of Plaintiff's *Ex Parte* Motion For Temporary
Restraining Order (attached to Plaintiff's *Ex Parte* Motion for Temporary Restraining Order).

27

dissipate assets if they were to receive advance notice of the FTC's Motion and proposed Temporary Restraining Order.[58]  In short, if Defendants' assets are not preserved, those assets may disappear and be unavailable to redress consumer injury.

### 1.    Receivership

The appointment of a receiver over the corporate Defendants is necessary to preserve the potential for a complete remedy.  Defendant Ira Rubin, who has overseen the creation and operation of the corporate Defendants' ACH processing business, should not be left in control of these corporations pending resolution of this case.  Otherwise, the entire nature of the dispute, discovery, and the ultimate proof of the case will likely be hampered by the alteration or destruction of corporate records.  By taking custody of the businesses, a neutral receiver will prevent destruction or concealment of assets and records, including vital computerized records that could be destroyed with the touch of a button.  Similarly, a receiver would be in the best position to deal immediately and appropriately with any pending transactions.[59]

Rubin's business is permeated by fraud and deception. The evidence strongly suggests that he has few, if any, legitimate clients.  Indeed, an internal investigation recently

---

[58]    *See id.*

[59]    As indicated the FTC's Proposed Temporary Restraining Order, the Commission requests the appointment of a temporary receiver with the authority of acquiring, managing, and holding the corporate Defendants' assets.  The receiver's responsibilities should include the ability to bring actions to freeze and/or recover the corporate Defendants' assets wherever they may be located, and to protect and preserve the corporate assets during the pendency of this proceeding.

completed by Bank of America's Anti-Money Laundering and Surveillance Unit indicates

that illicit telemarketers are just of one of many different types of problematic clients for

whom Rubin provides payment processing services. Specifically, the Bank of America

investigation concerned nearly $40 million of suspicious transactions facilitated by Rubin

between February 2005 and March 2006.[60] Investigators found that the majority of this

activity concerned high risk merchants, such as diamond traders, currency brokers, and

telemarketers, as well as offshore pharmaceutical and gambling websites.[61] For example,

Bank of America found that Defendants processed $13 million on behalf of one of the

ringleaders of a multi-million dollar drug distribution network shut down by the U.S. Drug

Enforcement Administration in September 2005.[62] Bank of America also concluded that

most of Rubin's transactions originated from, or went to, "problem" countries such as Belize,

Estonia, Cayman Islands, Kyrgyzstan, Cyprus, Antigua, Costa Rica, and the Phillippines.[63]

These findings are hardly surprising given Rubin's extensive criminal record, which includes

a federal prison sentence for bank, wire, and mail fraud.[64] Accordingly, a receivership in this

case is particularly appropriate. *See In re McGaughey*, 24 F.3d 904, 907-908 (7th Cir. 1994)

---

[60]  PX 6 Howell ¶ 7 (Cynthia Howell, Vice President and Senior Compliance Officer, Bank of America).

[61]  *Id.* at ¶ 8.

[62]  *Id.* at ¶ 7.

[63]  *Id.* at ¶ 8.

[64]  *Id.* at ¶¶ 3-5; PX 1 McKenney ¶ 6 Att. I.

("Debtor had a history of fraud, tax evasion, and asset dissipation . . . such that the appointment of a receiver would be prudent").

## 2. Asset Freeze

A district court has "a duty to ensure that . . . assets . . . [are] available to make restitution to injured customers" where the court determines that it is "probable that the FTC [will] prevail in a final determination of the merits." *World Travel*, 861 F.2d at 1031. This Court has authority to order a party to "freeze" property under its control, whether the property is within or outside the United States. *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965). The risk of asset dissipation is of particular concern here given Rubin's extensive use of overseas bank accounts, his past indictment for money laundering and wire fraud, and the ease with which a payment processor such as himself could move funds around.[65]

## 3. Other Equitable Relief

The FTC's proposed TRO includes additional narrowly tailored ancillary equitable relief. Specifically, the proposed order requires Defendants to preserve records, provide an accounting of funds obtained from defrauded consumers (irrespective of where such funds are located), and repatriate assets. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346-48 (9th Cir. 1989) (affirming injunction ordering defendant to transfer foreign funds to an institution within the district); *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1276 (9th Cir. 1989)

___

[65]     *See* PX 6 Howell ¶¶ 3-8; PX 2 Broderick ¶ 6; PX 1 McKenney ¶ 20(h) Att. CC p.46.

(court's authority to order an accounting extends to assets held abroad); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1021 (N.D. Ind. 2000) ("In order to satisfy an award of equitable monetary relief, a court may order the repatriation of assets").  The FTC also seeks leave to conduct limited expedited discovery so that it may locate assets wrongfully obtained from consumers and preserve documentary evidence.

## IV.     CONCLUSION

Defendants have caused and are likely to continue to cause substantial consumer injury through their FTC Act and TSR violations.  Plaintiff requests that this Court enter the proposed Temporary Restraining Order to prevent further consumer harm and to help ensure the possibility of effective final relief.

Respectfully Submitted,

WILLIAM BLUMENTHAL
General Counsel

DATED:  Dec 8  , 2006

JAMES H. DAVIS
DAVID A. O'TOOLE
Federal Trade Commission
55 East Monroe Street, Suite 1860
Chicago, Illinois 60603
Voice: (312) 960-5634
Fax:    (312) 960-5600
email:  jdavis@ftc.gov
        dotoole@ftc.gov

31